### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br>    Plaintiff,<br><br>v.<br><br>**MARIO RAFAEL CASTILLO,**<br>    Defendant. | CRIMINAL Nos.   17-206 (PG)<br>                          17-275 (PG) |

### UNITED STATES' SENTENCING MEMORANDUM

**TO THE HONORABLE COURT:**

The United States of America, by and through the undersigned attorneys, very respectfully files this Sentencing Memorandum.

**I.   Introduction**

Defendant Mario Rafael Castillo is scheduled to be sentenced on September 19, 2018. On December 18, 2017, he pled guilty to Count Two of the Indictment in Case 17-CR-275. The plea agreement included a stipulated penalty range of 78-180 months, whereby the parties are free to argue for any sentence within that range, but this Court is free to sentence anywhere within the statutory range up to life imprisonment. This memorandum explains why the United States believes the Court should consider sentencing the defendant at the top of the agreed range.

**II.   Background**

From August 23, 2011 through August 11, 2014, W.C., Sergeant First Class (SFC) in the United States Army, was stationed overseas at East Camp in Vilseck, Germany. While stationed in Germany, the defendant, Mario Rafael Castillo, accompanied W.C. as an official accompanying dependent. Defendant, who is a 69-year-old citizen of the Dominican Republic, resided with W.C. during that time period in Germany.

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

Approximately one-and-a-half years after returning to the United States from Germany, two children—Female Minor-1 (FM-1) and Female Minor-2 (FM-2)—both reported that the defendant had engaged in sexual activity with them while they were all in Germany. A report to United States Army Criminal Investigations Division (CID) about the allegations prompted the investigation.

The investigation revealed that, on at least one occasion in Germany, while FM-1, a child under the age of 12, was playing on the bed with her iPad, the defendant pulled her pants and underwear down to her knees and "licked the outside of her parts," meaning her genitalia. On another two occasions, the defendant tried to pull FM-1's pants down again but was unable to because of the tight belts that the girl began to wear after the first incident.

With regard to FM-2, a child under the age of 12, the defendant tried to pull the younger girl's pants down and, at another time, he touched her inner thigh with his hands with an intent to arouse or gratify the sexual desire of the defendant.

Upon learning about what the girls reported, SFC W.C. confronted the defendant over the phone about the girls' allegations. The defendant initially denied that anything happened, but later apologized to W.C. After being confronted by SFC W.C., the defendant left for the Dominican Republic on or about March 27, 2016. On November 25, 2016, Defendant was arrested in Puerto Rico on a criminal complaint issued out of the Western District of Texas. Subsequently, that case was transferred to the District of Puerto Rico.

On November 25, 2016, in a post-*Miranda* interview, Defendant explained:

Because the mother worked. I would do everything at the house, I cleaned… the girl's clothes, once when I went to wash them, I smelled a, a bad odor from a *panty* and I said to her: "Come here"… after I washed it, when she came from school, I said to her: "Look, why does that *panty* smell of that?" She says: "Uh, I don't know." Because I asked her: "Do you wash yourself properly?" She was like six years old,

2

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

> I think. Then I took her to the bathroom and told her: "How… you have to know how to wash yourself." I didn't put, I didn't touch her, but I told her: "Spread your legs." Then I, with my hand, I made the shape more or less of her, of her part. And I said to her: "You have to wash yourself, pour, pour water on yourself, with your legs spread open, and run your little hand by, by there. Because that goes bad, it gets sick, it can harm you." I was with her in the bathroom and she was unclothed. I mean, I did it to teach her, but not with malice. uh, she told me that she… that her mother had told her not to let herself be seen, uh, seen naked. And I told her: "No, I understand that." Then I told the mother: "Look, you have to teach your daughter to clean her, her, her [UI] because she's going to get sick." And I would say that to her all the time, but I don't know whether she would do it.

(Castillo Interview Tr. 66.)

> Later, in the same interview, Defendant further minimized his behavior:

> Well, there was one time with [FM-2]… [FM-2] [UI] gets things confused [UI] once with [FM-2], when I was playing, because I used to play a lot with them at the house, I was always, I was with them at the house. And once she, once when I was on, on, on the, on the back of the living room watching TV and she: "Oh, papa." Because she, she is crazy about me, both of them. And then she, she, she jumps on me and, uh, and then, unintentionally, at the moment I was also playing, my mouth came close to, to, to here [points to the genital area] [UI] and, since I have dentures, and it was, a tooth was wanting to fall out, she was saying: "Oh, [redacted], you bit me there." And I told her: "No, I didn't bite you, honey, it was unintentional." Well, but if I had that, how can I tell you, that, that… if I failed by touching them at a particular time so, so they would know how to do their own hygiene, well I didn't know how far I could touch them and get in trouble. I didn't know…I, I did it innocently.

(Castillo Interview Tr. 76-78.)

Later, Defendant, in response to further questioning, admitted, "I put my mouth like they say on their, on their little vulvas." (Castillo Interview Tr. 120.)

Defendant subsequently pled guilty, admitting to the facts related to FM-1 and FM-2. Though not part of the factual basis for his plea, there is at least one other person who has accused Defendant of sexual assault, also when she was a child. On August 3, 2016, that individual, FM-3, now an adult, stated that "I did experience something that was not right" with Defendant when FM-3 was a prepubescent (approximately 5-7 years old). She struggled to explain it, but did

3

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

expressly state that Defendant touched her, made her touch him, and oral sex was involved. She further explained that he touched her chest area and in between her thighs, including cupping his hand on her vaginal area. He used his hands to rub her, and sometimes his mouth. He sometimes made her perform oral sex. She would have to hold his penis and put her mouth on it. These events occurred multiple times, and always when other people were away from the house when Defendant was "babysitting" FM-3. She further recalled having a conversation with him some years later in which he apologized to her for what he did to her.

>With regard to FM-3, Defendant made similar minimizing statements:

>I did the same with [FM-3] [UI] I lived with them up until what year… uh… let me see [UI] with me [UI], already about three years, three or four. Because they separated [UI] that son of mine with, with her, and her mother took her to *New York*. Then, she, I would do the same thing with her, I would take care of her, I would teach her to wipe-to wipe herself. I mean, I wouldn't, wouldn't touch her there but I would tell her how, how to wipe herself. And to always be very hygienic with her body and her clothing. Well I, I say, I don't know what's happening, whether they're misinterpreting something, the girls. Because everything I did was to take care of them, it was not to harm them not to take advantage of them.

(Castillo Interview Tr. 171.)

### III. The United States' Recommendation for each Defendant is Reasonable and Necessary to Comply with § 3553(a)

The recommendations of the Sentencing Guidelines are no longer mandatory, but sentencing courts "must consult these Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). The Sentencing Guidelines are "the 'starting point and the initial benchmark.'" *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007) (noting that the Guidelines should "be kept in mind throughout the process"). The sentencing court must conduct a two-step process: first calculating the sentence using the advisory Sentencing Guidelines, and then applying an individualized

4

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

assessment under the statutory sentencing factors set forth in 18 U.S.C. § 3553(a). *United States v. Boulware*, 604 F.3d 832 (4th Cir. 2010). These factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant.
>
> ….
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

18 U.S.C. § 3553(a).

Here, the Sentencing Guidelines for the defendant recommend imprisonment for a term between 235 and 293 months, but the statutory maximum is Life. Regardless of the Guidelines range, there are ample reasons to impose a sentence at the upper end of the agreed range. Below, the United States argues why a sentence at the upper end of the agreed range of 78-180 months is justified.

### A.    Nature and Circumstances of the Offense

The nature and circumstances of this offense are particularly egregious. This is not the typical child pornography defendant that this Court usually encounters. Indeed, much has been discussed in the past few years regarding the relative dangerousness of offenders who are "merely" downloading images of child sexual abuse from the internet. Defense attorneys often argue for leniency for such defendants because they "never touched a kid." But Defendant Castillo is very different in that he clearly did engage in the hands-on sexual abuse of children.

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

Yet even in the category of contact offenders, Defendant's actions are far outside the mine run of such cases. In other words, this is not a case where a 30-year-old man enticed a high school girl to engage in "consensual" sex. Quite the contrary, this elderly Defendant preyed on children under the age of 10. He preyed on more than one child, and he always used his position of trust with these children, who were in his care, to manipulate them into sexual scenarios. The sexual contact—"I put my mouth … on their little vulvas"—was also especially disturbing. The extreme youth of the children, the fact that his victims are multiple, not singular, and the fact that he was in a special trust relationship with them all are circumstances of the offense that make this case especially egregious and deserving of a higher sentence.

### B.     History & Characteristics of the Defendant

It is worth noting that during his interview for the PSR, "per advice of counsel, the defendant did not discuss his life circumstances at the time he committed the offense and what might have led him to commit them." (PSR at ¶ 30.) But then he did discuss his personal history when he was interviewed for the psychological evaluation in anticipation of sentencing. In that interview with Dr. Miller, Defendant explained that he was born and raised in a "positive and nurturing home environment" in the Dominican Republic. Unlike many defendants who claim their offending behavior is traced to being abused, Defendant was not exposed to domestic violence nor was his sexually abused as a child. He spent most of his adult life gainfully employed, did not have any mental health problems, and did not have any substance abuse problems. In sum, he had nothing remarkable that could remotely explain why he engaged in this criminal sexual behavior with multiple children under the age of 12.

Again, the vast majority of child exploitation cases involve a defendant who points to his own childhood abuse or some other negative aspect of his upbringing to place his own offending

6

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

behavior in context. There is no such event or experience in Defendant Castillo's background. Quite simply, he committed these heinous crimes because he wanted to do so. He is sexually attracted to children, and he acted on his attraction when the opportunities arose.

Remarkably, when asked about the impact his actions have had on the victims, he very selfishly responded, "[t]hey must feel bad and they are feeling bad for what he is going through because they were close." (PSR at ¶ 31.) In other words, when given the opportunity to demonstrate insight into his own criminal behavior, he rationalized that the victims feel guilty for Defendant being in prison. Nothing could be further from the truth, and this lack of insight demonstrates a characteristic of this defendant that militates in favor of a higher, not lower sentence. Indeed, the victim impact statement from FM-1 makes it abundantly clear that she does not feel guilty for his predicament (nor should she), but instead is working on understanding that despite his attempts to manipulate her mind (not to mention her body), she is not to blame, only Defendant is to blame. The fact that this very young child has greater insight into the culpability attributable to Defendant than he does, strongly weighs in favor of a more serious sentence based upon his own history and characteristics.

      **C.**    **Seriousness of the Offense, Promoting Respect for the Law, Providing Just Punishment**

Defendant should be sentenced to a significant term of imprisonment because his criminal conduct has a high likelihood of resulting in the premature death of FM-1, FM-2, and FM-3. While that sounds like an assertion borne of speculation and bordering on hyperbole, there is strong scientific support to show that because of the sexual abuse these children suffered at the hands of Defendant, they are at an increased risk of falling prey to alcohol abuse, illicit drug use, sexual promiscuity, and suicide.

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

In the late 1990s, the Kaiser Permanente San Diego Health Appraisal Clinic, a primary care clinic where more than 50,000 adult members of an HMO receive medical examinations, began a study to examine the long-term relationship between Adverse Childhood Experiences (ACEs) and a variety of health behaviors and health outcomes in adulthood. An ACE was defined to include an experience occurring to the adult before the age of 18 such as verbal abuse, physical abuse, contact sexual abuse, a battered mother, household substance abuse, household mental illness, incarcerated household members, and parental separation or divorce.

First, they took a survey of adults who were members of the Kaiser HMO to determine the number of ACEs experienced. The survey data was collected in 1995-1997. Then, in early 2009, using the National Death Index mortality data, researchers analyzed how many of the 17,337 original survey respondents were deceased 10 years after the survey. The results were startling. "People with six or more ACEs died nearly 20 years earlier on average than those without ACEs." David W. Brown, et al, *Adverse Childhood Experiences and the Risk of Premature Mortality*, 37 American Journal of Preventive Medicine 389-96 (2009). In other words, if a person in the control group lived to 79.1 years old, that same person will only live to age 60.6 years old if she experienced six or more ACEs before the age of 18.

While it is certainly alarming to know that serious negative experiences in childhood could be correlated with such a precipitous drop in life expectancy, the ACE Study expressly observed that "[t]here are several reasons to believe that these estimates of the relationship between ACEs and premature death are *conservative*." (*Id*. at 394 (emphasis added).) Indeed, when the initial survey was conducted in 1995-1997, approximately 60% of the survey respondents were already 50 years or older. Given that fact, "it is reasonable to postulate that people who are exposed to ACEs (particularly multiple ACEs) are more likely (compared to those who are unexposed) to be

8

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

aborted; die during childhood or young adulthood; be institutionalized; or be otherwise lost prior to the initiation of the ACE Study." (*Id*. 394-95.) In addition, the survey respondents were of a population who were enrolled in a major health plan at that time, i.e., "predominantly white, middle-class adults." (*Id*. at 394.) Due to these facts about the survey population, "the association between ACEs and premature all-cause mortality would be biased downward." (*Id*. at 395.) In other words, it is reasonable to conclude that an ACE victim's risk of premature mortality is even greater than the ACE Study results show.

      Additional research using the same survey data has drilled deeper to better understand the relationship between the severity of the childhood *sexual* abuse (not just adverse childhood experiences) and the long-term health and social problems. *See* Shanta R. Dube, et al, *Long-Term Consequences of Childhood Sexual Abuse by Gender of Victim*, 28 American Journal of Preventive Medicine 430-38 (2005). First, the study bifurcated the population of sexual abuse victims by classifying them into "sexual abuse, no intercourse" and "intercourse." Intercourse was defined as answering yes to the question of whether any "adult, relative, family friend, or stranger ever" attempted or actually had "any type of sexual intercourse with you (oral, anal, or vaginal)." In this case, Defendant Castillo's actions would qualify as "intercourse" for purposes of this particular study due to his oral sex, both completed and attempted.

      Using those definitions and categories, the study showed that adult women who were sexually abused in the form of intercourse as a child, were 360% more likely to attempt suicide than women who had never been sexually abused as a child. (*Id*. at 432, Table 4.) Equally unsettling was that even the children who experienced non-intercourse sexual abuse (so-called "just fondling") were 80% more likely to attempt suicide than those who had never been sexually abused. Sadly, this data set does not (because it cannot) include actual suicides, which undoubtedly

9

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

would increase the odds described in the study. In addition to suicide risk, non-intercourse female child sexual abuse victims were 60% more likely to use illicit drugs ("street" drugs, e.g., meth, heroin, cocaine), and 50% more likely to have alcohol problems. Even worse, intercourse victims were 90% more likely to do each. (*Id.*)

Yet another analysis of the same data looked at whether exposure to ACEs increased the risk of adolescent pregnancy and fetal death. *See* Susan D. Hillis, et al, *The Association Between Adverse Childhood Experiences and Adolescent Pregnancy, Long-Term Psychosocial Consequences, and Fetal Death*, 113 Pediatrics 320-27 (2004). Compared with women who did not report any ACEs, there was a 60% increased risk in adolescent pregnancy for those who experienced childhood sexual abuse. (*Id.* at 322.) More disturbingly, "a strong and independent trend was observed for the association between ACE score and fetal death as the outcome of the first pregnancy." (*Id.* at 323.) In other words, even an ACE score of 1 resulted in a 7.6% increased risk in that woman's first pregnancy resulting in fetal death. (*Id.*) Furthermore, "[a]s the ACE score rose in these younger women, the risk of fetal death as the outcome of the first pregnancy increased." (*Id.* at 323-24.) In sum, "the cumulative and chronic exposure to stress associated with ACEs during childhood led to an increased risk of nonviability for the infant, persisting through both the first and second pregnancies." (*Id.* at 325.)

In this case, we can already see signs of the long-term consequences of Defendant's actions. That is, the girls' "schooling and grades have been affected and they have missed numerous days due to feeling depressed as their moods fluctuate." (PSR at ¶27.) This is where the spiraling negative consequences begin: first with depression and bad grades, but then it will get so much worse. The scientific articles interpreting the ACE Study very clearly demonstrate the profound long-term consequences of various kinds of adverse childhood experiences, especially

10

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

childhood sexual abuse. For the multiple children who were exposed to repeated sexual abuse by Defendant, including attempted oral intercourse, they now have a significantly increased risk of attempting suicide, using illicit drugs, and having alcohol problems. In addition, they are at substantially greater risk of getting pregnant as an adolescent, and, independent of when they get pregnant, they are far more likely to have their first or second pregnancy end in the death of their baby before birth. Finally, there is an increased chance that they will each die 20 years early. All because Defendant repeatedly chose to use them as a sexual object for his own base gratification. In short, Defendant has forever impacted these children's lives in ways that have significant long-term health consequences, and thus his abuse of them over an extended period will redound to their detriment in profound ways. Therefore, a significant sentence of imprisonment would be both reasonable and appropriate—"just punishment" in § 3553(a) language—given the lifelong consequences that they will likely experience due to Defendant's repeated and reprehensible acts.

### D.      Adequate Deterrence & Protect the Public

The PSR makes clear that the victims in this case fear that Defendant might contact her or possibly even show up in person one day. *See* PSR ¶ 27 ("FM1, the oldest, fears the defendant may just show up some day or reach out to her.") Consequently, this Court should impose a sentence at the upper end of the agreed range to provide specific deterrence to this defendant, and, more importantly, to give these girls as many years as possible to grow up without fear that he will show up and confront them. A sentence of 180 months would allow these girls to be well into adulthood before they ever had to worry again about him appearing in their lives.

In addition to the specific deterrence and protection of the victims in this case, a sentence of 180 months is necessary to protect the public at large from Defendant's propensities. While the defense might argue that Defendant would be an "old man" by the time he was released on a 180-

11

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

month sentence, there is good reason to ensure that he is as old as possible to minimize his danger to the public. Indeed, even if Defendant were imprisoned long enough that he would be *less likely* to commit sexual assaults on children, scholarly research in this area demonstrates that sexual predators like Defendant will simply change their *modus operandus*. *See* Matt Hart, *The Geriatric Sex Offender: Senile or Pedophile?*, 32 Law & Psychol. Rev. 153 (2008). In that article, the author notes that "[g]enerally, older sex offenders engage in more passive sexual activity as compared to their younger counterparts . . . [such as] fondling by elderly offenders is more prevalent than intercourse." *Id*. The article further explains that "[r]esearch has shown that elder offenders are more likely to commit 'nonviolent' sexual offenses such as pedophilia or exhibitionism as opposed to 'violent' offenses such as forcible rape." *Id.* Examples of such "nonviolent" offenses include "improperly touching an acquaintance, statutory rape, exposing of the genitals (usually to a minor), and other acts of exhibitionism." *Id*.

It is beyond peradventure that Defendant's life-long sexual interest in children, combined with his desire to seek out situations that put him in close proximity to young children is enough to demonstrate that he has a deviancy that has and will continue to put the community at risk regardless of his age. Indeed, Defendant was already in his 60s when he committed the crimes against FM-1 and FM-2. There is no reason to believe that he will be less interested in molesting children in his 70s or 80s. Accordingly, a sentence at the upper end of the agreed range is imperative to adequately protect the community from Defendant.

### E.     Need to Avoid Unwarranted Sentencing Disparities

There are numerous examples of cases with similar facts resulting in sentences far in excess of what the United States is seeking here. For example, in *United States v. Evans*, 14-CR-333 (N.D. Al. Mar. 16, 2016), the defendant was prosecuted under MEJA for sexually abusing a

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

prepubescent minor over the course of about 18 months in Germany while there with the military. He had no criminal history, was honorably discharged from the military at the time of the offense, and was ultimately sentenced to 55 years in prison. Similarly, in *United States v. Joey*, 14-CR-08122 (D. Ariz. Mar. 4, 2015), the defendant was charged with a § 2241(c) violation, but ultimately convicted of the lesser offense of abusive sexual contact in violation of § 2244(a)(5). The contact included one under-the-clothes touching of an 8-year-old boy's penis, an over-the-clothes touching of that boy's penis, as well as over-the-clothes touching of the chest area of a 9-year-old girl. His Guidelines range was 324-405 months, but the Court sentenced him to life. Yet again, in *United States v. Colwell*, 11-CR-182 (E.D.VA May 24, 2012), the court sentenced an active duty sailor to 480 months in prison for sexually abusing a 9-year-old girl for about 18 months. The defendant had no criminal history and pled guilty. Due to his guilty plea, which spared the victim from the trauma of having to testify, the United States agreed to a sentencing range of 420-480 months, and the court sentenced him at the top end of that range.

**IV.    Lifetime supervised release is reasonable and appropriate**

Regardless of the term of imprisonment, this Court should impose a term of supervised release that extends for the life of each defendant. "Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Supervised release is not a punishment in lieu of incarceration. *See United States v. Granderson*, 511 U.S. 39, 50 (1994). If being on supervised release were the punitive equivalent of being in prison, and if it served the just desserts function, there would be no need to put most criminals in prison. *See United States v. Irey*, 612 F.3d 1160, 1210 (11th Cir. 2010). The life term recommendation contained in Section 5D1.2(b) is evidence that recidivism rates for sex offenders do not appreciably decline as offenders age. *See* H.R. Rep. No. 107-527, at 2 (2002) (discussing

13

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

the merits of a life term of supervised release for sexual offenders); *see also supra* (discussing defendants over the age of 60 who have committed similar federal child exploitation crimes). Because, in sex crimes cases, there is no reason to believe that the need for supervision inherently decreases with time, Congress found lifetime supervised release to be appropriate, and thus directly inserted such a recommendation into the Guidelines. *See id*. More specifically, the passage of 18 U.S.C. § 3583(k) recognized the long-standing concerns of federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders, particularly for the perpetrators of child sexual abuse crimes, whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison. Many of these offenders need long term or lifetime monitoring and oversight. *See* H.R. Conf. Rep. No. 108-66, at 49-50 (2003), *reprinted in* 2003 U.S.C.C.A.N. 683, 684.

**V.     Conclusion**

This Court has the opportunity to provide Defendant's victims with a chance at peace and closure by ensuring that Defendant receives a significant punishment so that the victims are likewise ensured that Defendant may never harm them again.

Defendant abused these children for a few years, but in so doing, he gave them each a lifetime of hard conversations. To really know them is to know about Defendant and what he did to them. Forevermore, each of these girls will have to have embarrassing, stressful, awful conversations with every friend they ever have, ever boy they ever date seriously, and some day their own kids. It is one of the burdens that Defendant saddled them with for the rest of their lives. It is an albatross of anxiety whose stinking, rotting corpse cannot be buried, but instead must be shouldered by each of these girls until they are each laid to eternal rest. Their lives are forever

*United States' Sentencing Memorandum*
*U.S. v. Mario Rafael CASTILLO, 17-206 & 17-275 (PG)*

changed in the most profound ways; his life should be behind bars, for an extended period, where children cannot be further harmed by him.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 11th day of September 2018.

**ROSA EMILIA RODRIGUEZ-VELEZ**
United States Attorney

*s/Cristina Caraballo Colón*
Cristina Caraballo
Special Assistant United States Attorney
USDC-PR No. 300508
350 Chardón Ave Ste 1201
San Juan, Puerto Rico 00918
Telephone:  787-766-5656
cristina.caraballo@usdoj.gov

*s/ Austin M. Berry*
Austin M. Berry
Trial Attorney
Child Exploitation & Obscenity Section
Department of Justice
1400 New York Ave.
Suite 600
Washington, D.C. 20005
Austin.Berry2@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this same date, the foregoing was filed with the Clerk of the Court using CM/ECF system, which will submit notification of such filing to all attorneys of record.

*s/Cristina Caraballo Colón*
Cristina Caraballo Colón
Special Assistant United States Attorney